# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ELLIS EUGENE PHELPS,

     Plaintiff,

v.

T-MOBILE USA, INC.,

     Defendant.

Civil Action No.
1:20-cv-04102-VMC

## OPINION AND ORDER

The Court held a bench trial in this diversity action on December 17, 2024 (Doc. 91). Plaintiff Ellis Eugene Phelps appeared pro se. Matthew Leonard appeared for Defendant T-Mobile USA, Inc. ("T-Mobile"). The Court heard testimony from Mr. Phelps for the Plaintiff and from Jason Mills for the Defendant. The Court admitted Plaintiff's Exhibits 1, 2, 6, 7, 8, 9, 12, 16, 18, as well as exhibit 11 by Defendant, and took Plaintiff's Exhibit 3 under advisement. (Doc. 92). The Court also admitted Defendant's Exhibits 3 and 6 and took Exhibit 4 under advisement. (Doc. 95). After the trial, the Court took the matter under advisement. This Opinion and Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

For the reasons that follow, the Court finds for the Plaintiff. Judgment will enter accordingly.

## Findings of Fact

On September 25, 2019, Plaintiff Ellis Phelps went to a T-Mobile location to purchase two iPhones. He previously had service with Metro PCS, but his testimony was unclear as to whether he had four lines or two lines of his own plus his two daughters' separate lines. But as the Court explains below, Mr. Phelps ended up with four lines at T-Mobile, with at least two being transferred from Metro PCS.

Plaintiff entered into an Equipment Installment Plan (EIP) Contract for the purchase of two iPhone 11s on September 25, 2019. (Def's Ex. 4, Doc. 95-2).[1] For two of the lines, he did not purchase devices. The EIP provided the following relevant terms:

> **Agreement to Purchase and Make Payments.** Except as provided below, you agree to purchase from Seller ("we," "us," or "our") the items described above (the "equipment") on the terms set forth in this agreement. Affiliates of T-Mobile Financial LLC ("T-Mobile Financial", and together with its affiliates, "T-Mobile", "we," "us," or "our") provide wireless service to you (the "Service"). Subject to our delivery to you of the equipment identified above and purchased by you, and subject to your right to cancel this agreement as provided below, you agree to make payments according to the payment schedule above. In addition, you agree to maintain Service on any equipment purchased under

---

[1] The Court took Mr. Phelps' objection to Exhibit 4 under advisement, but after consideration of the record as a whole, admits the EIP as relevant to Mr. Phelps's claims and T-Mobile's defenses and overrules the objection.

this agreement for the term of this agreement. . . . You may prepay this agreement, in whole or in part, at any time without penalty. Partial prepayments will not change your obligation to continue to make scheduled payments, except that you may finish making payments early. This is a one-time extension of credit by us to you.

You have the right to cancel this agreement within 14 days (or more based upon where you made the purchase) of your acceptance and return the equipment in accordance with our return policy. If you exercise this right you will have no payment obligation under this agreement. Your equipment may not work with wireless services or on wireless networks that are not provided by T-Mobile. . . .

**Equipment Refunds and Restocking Fees.** For equipment returns and exchanges, see our return policy. Some equipment may not be refunded or exchanged, and/or you may be required to pay a restocking fee. This agreement applies to any equipment provided to you in exchange for the equipment originally purchased pursuant to this agreement.

(*Id.* at 2, 4). Plaintiff paid $592 for the down payment and taxes for the two iPhones.

(*Id.* at 2).

Plaintiff also signed a document entitled "Service Terms" dated September 25, 2019. (Def.'s Ex. 3, Doc. 95-1). The Service Terms contained an "Account & Lines Description" listing four lines. (*Id.*). The Service Terms contained the following provisions, among others:

By accepting this form, activating or using T-Mobile service, you agree that:

- Your first service cycle may start several days after your activation. International rates and roaming

3

charges may apply. Certain rates are subject to change at any time. If you have a device or accessory under one of our device programs, refer to your agreement for the specific terms and conditions of that program.

- You may be charged a one-time Assisted Support charge of $20 per line of Service.

- You agree to submit military verification within 45 days of Activation to confirm your eligibility for the Magenta Military rate plan and if you do not, or if the documentation is not valid, you will be moved to the Magenta rate plan at an additional cost of up to $20 per line/per month. . . .

- Your "Agreement" with T-Mobile includes: (a) this Service Agreement; (b) T-Mobile's "Terms and Conditions"; and (c) any terms specific to your Rate Plan or service. . . .

- Cancellation Policy. You may cancel your Rate Plan by going back to the original point of purchase and returning all devices you acquired with your activation within 14 days from your activation date (Cancellation Period). . . .

(*Id.*).

The phones were mailed to Mr. Phelps and arrived on the 26th. The next day, Mr. Phelps apparently became concerned that the terms he was signed up for at the store did not reflect his understanding of what was discussed at the store and began taking steps to undo the transaction.

On September 28, 2019, Mr. Phelps prepaid the EIP for both iPhones in full. On October 1, 2019, he attempted to return the phones in the store, but the store

would not take the phones, ostensibly because they were shipped to him directly instead of purchased in store. Mr. Phelps refused to leave until the phones were taken back, the police were eventually called, and Mr. Phelps was arrested. But in the end, the store provided him with return labels, and at some point later in October, Mr. Phelps returned the two iPhone 11 handsets that he purchased on September 25, 2019. After he shipped the devices back, T-Mobile refunded the initial down payment of $529. However, T-Mobile did not refund the prepaid EIP.

On October 23, 2019, Mr. Phelps filed a Statement of Claim against Defendant in the Magistrate Court of Gwinnett County, Civil Action No. 19-M-38162 ("State Court Claim," Doc. 56-3 at 2).[2] In the portion of the State Court Claim for indicating the nature of the suit, he wrote, "Deceptive Sales & Business Practices." (*Id.*). In the portion of the State Court Claim for indicating the basis of the claim, Mr. Phelps wrote:

> T-Mobile used deceptive sales & business practice to sale [sic] services they could not provide [illegible] refused to refund "All" of my money even though "All" thier [sic] property was returned. T-Mobile knew or should have known it would cause confusion and/or misunderstanding.

(*Id.*). The State Court Claim demanded $10,000.00 plus $106.00 in costs. (*Id.*).

---

[2] The Court already took judicial notice of the pleadings of the Gwinnett County court. (Doc. 26 at 3 n.2).

On January 23, 2020, the Magistrate Court of Gwinnett County entered judgment on the State Court Claim against Defendant in the total amount of $1,089.24. ("Judgment," Def.'s Ex. 6, Doc. 95-6). T-Mobile's counsel sent a check for $1,089.24 in satisfaction of the judgment on March 2, 2020. (Pl.'s Ex. 8, Doc. 92-6; Pl.'s Ex. 9, Doc. 92-7). The letter specified that Mr. Phelps's account with four lines of service was still active and requested his written authorization to close/cancel his account. (Pl.'s Ex. 8, Doc. 92-6; Pl.'s Ex. 9, Doc. 92-7). However, it was Mr. Phelps's understanding that the return of his devices terminated both the EIP and the Service Terms with T-Mobile, and no further action was necessary to terminate the account.

T-Mobile sent a suspension notice and bill for $1,125.06 to Mr. Phelps dated May 7, 2020, (Pl.'s Ex. 7, Doc. 92-5), and a final notice before collections dated May 22, 2020. (Pl.'s Ex. 8, Doc. 92-6). At some point prior to May 23, 2020, T-Mobile referred Mr. Phelps for collections with Convergent Outsourcing, who sent him a collections letter seeking $1,125.06 dated May 23, 2020. (Pl.'s Ex. 1, Doc. 92-1). Mr. Phelps later received a collections letter from AmSher Collection Services for the amount of $1,100.73 dated July 2, 2020. (Pl.'s Ex. 2, Doc. 92-2). AmSher also reported the balance to the Experian credit bureau. (*Id.*). Mr. Phelps testified credibly that he was stressed out and could not sleep because of the collection

notices and dealings with T-Mobile. He testified further that he had anxiety attacks.

As of June 2020, Mr. Phelps still had not cashed the check from T-Mobile. (Pl.'s Ex. 11, Doc. 95-4). Mr. Phelps sent T-Mobile correspondence dated June 4, 2020. (*Id.*). In response, T-Mobile's counsel sent a letter, among other things stating that "the January 23, 2020 judgment was a monetary judgment. The court had no authority or power to close your T-Mobile account." (*Id.*). The letter offered to close/cancel his account and zero-out the balance in exchange for a full release of claims. (*Id.*).

T-Mobile's corporate office also sent Mr. Phelps a letter dated June 18, 2020, which stated that it had "received [his] recent correspondence regarding [his] Cease and Desist notice regarding the unpaid balance for the above-referenced account." (Pl.'s Exs. 3 & 6, Docs. 92-3 & 92-4).[3] The June 18 letter reiterated T-Mobile's position that cancellation had to be by written request and stood by its charges. (Pl.'s Exs. 3 & 6, Docs. 92-3 & 92-4).

---

[3] The Court assumes that the second page of Plaintiff's Exhibit 3 scanned into CM/ECF is the second page of the letter dated June 18, 2020 from Plaintiff's Exhibit 6. The Court took Exhibit 3 under advisement on authenticity and completeness grounds. T-Mobile's objection to Page 1 of Exhibit 3 is sustained, but to the extent Page 2 is part of Exhibit 6, the objection is overruled because the Court finds that the letter is more likely than not what it purports to be.

T-Mobile offered the testimony of Store Manager Jason Mills, who testified that his understanding of T-Mobile's policy in 2019 was if a device was purchased in a store, it could be returned in that "channel." However, if the device was purchased "direct ship," meaning arranged at the store to be shipped from a warehouse to the customer, his understanding was that the only way to return those devices would have been to ship them back to the warehouse where they were shipped from, and not in store. He also testified that in 2019, his understanding was that retail stores could not cancel lines of service, and that a customer care hotline would have to be contacted.

## Conclusions of Law

### I.    Libel Generally

Mr. Phelps's sole remaining claim is libel. "Georgia law[4] defines libel as the 'false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule.'" *Beckman v. Regina Caeli, Inc.*, 752 F. Supp. 3d 1346, 1370 (N.D. Ga. 2024) (quoting O.C.G.A. § 51-5-1(a)). The elements of a libel claim are "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant

---

[4] The Court (Jones, J.) has already determined that Georgia law applies to Plaintiff's cause of action. (Doc. 26 at 14).

amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Id.* (quoting *Smith v. DiFrancesco*, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017)).

The Court has already determined that Mr. Phelps "terminated his service with T-Mobile as a matter of law on October 8, 2019" and that T-Mobile "lacked a contractual basis to continue charging [Mr. Phelps] any service fees." (Doc. 82 at 23). T-Mobile's attempt to relitigate this issue through the testimony of one of its store managers is futile; the Parties' agreement as to how to terminate service is what the parties put in the Service Terms, not one store manager's understanding of what the agreement was. *See* O.C.G.A. § 24-3-1 ("Parol contemporaneous evidence shall be generally inadmissible to contradict or vary the terms of a valid written instrument."). Consequently, "[a]ny published statement by [T-Mobile] to a third party," such as a debt collector, that Mr. Phelps owed T-Mobile a debt for unpaid service fees "was false." (Doc. 82 at 23). However, whether he can recover for this publication depends on a complex survey of Georgia libel law.

## II.    Libel Per Se

While special harm or the actionability of the statement irrespective of special harm is the last element, courts generally begin the libel analysis by distinguishing between defamation per se, which is actionable regardless of special harm, and defamation per quod, which is only actionable if special harm

is proven. *Beckman*, 752 F. Supp. 3d at 1373. "To determine whether a statement is defamatory per se, courts look to 'the plain import of the words spoken.'" *Id.* (quoting *Bellemead, LLC v. Stoker*, 631 S.E.2d 693, 695 (Ga. 2006)). "For a statement to be recognized as defamatory per se, its words must be 'injurious on their face — without the aid of extrinsic proof.'" *Id.* (quoting *Bellemead*, 631 S.E.2d at 695). "[T]he court may not hunt for a strained construction in order to hold the words used as being defamatory as a matter of law." *Id.* (quoting *Bellemead*, 631 S.E.2d at 695) (internal quotations omitted, alteration in original).

Whether a false allegation that a person has failed to pay a debt can rise to libel per se is a complex question under Georgia law but is vital to answer in this case because Mr. Phelps did not prove special damages. *See Mell v. Edge*, 22 S.E.2d 738, 738 (Ga. Ct. App. 1942) (holding neither "mere annoyance or loss of peace of mind, nor even physical illness occasioned by the defamatory charge" are special damages.").[5]

Many courts, including the Eleventh Circuit,[6] have assumed that a charge that someone does not pay debts when due is never libel per se, relying on a

---

[5] Mr. Phelps also appeared to argue that his litigation expenses constituted damages, but if that were the case, there would be no distinction between libel per se and libel per quod — both would be available in any case as long as a lawsuit was filed.

[6] *See McGowan v. Homeward Residential, Inc.*, 500 F. App'x 882, 886 (11th Cir. 2012). While this Court must follow the Eleventh Circuit's binding interpretations of

Georgia Court of Appeals case, *Mell v. Edge*. *Id*. *Mell* involved allegations of libel

brought by a clerk in the railway mail service against a letter writer. The letter

writer "wrote a named congressman, chairman of the civil service commission of

the Federal government, and the plaintiff's employer . . . that the plaintiff owed

him a debt and refused to pay the same." *Id*. The clerk was not fired, and only

alleged that "in apprehension of losing his employment, became worried, ill, and

temporarily crazy." *Id*. The Georgia Court of Appeals held that because the letter

did not "mak[e] any charge in reference to the 'trade, profession, or business' of

the [clerk]," he did not state a claim for defamation per se. *Id*. In so holding, the

court set forth its understanding of the law as follows:

> As respects a charge of failure to pay debts, without any
> imputation of insolvency, it seems to be settled that a
> writing containing the mere statement that a person who
> is not a trader or merchant, or engaged in any vocation
> wherein credit is necessary for the proper and effectual
> conduct of his business, owes a debt and refuses to pay,
> or owes a debt which is long past due, is not libelous per
> se and does not render the author or publisher of such
> statement liable without proof of special damages.

*Id*. (quoting 33 Am. Jur. 78, § 60, *substantially reprinted in* 50 Am. Jur. 2d Libel and

Slander § 210, and citing *Estes v. Sterchi Bros. Stores*, 179 S.E. 222, 222 (Ga. Ct. App.

1935)).

---

Georgia law, *Great Am. E & S Ins. Co. v. Sadiki*, 170 F. App'x 632, 634 (11th Cir.
2006), *McGowan* was not published and is therefore not binding precedent. 11th
Cir. R. 36-2.

However, *Mell* did not grapple with or discuss earlier cases involving merchant blacklists. Cases like *White v. Parks*, 20 S.E. 78, 78 (Ga. 1894) and *Western Union Telegraph Co. v. Pritchett*, 34 S.E. 216, 216 (Ga. 1899) involved publicly "'blacklist[ing]'" a merchant "in writing, and thus publish[ing] of and concerning him that he is a delinquent debtor, when in fact he owes nothing, tend[ing] to injure his reputation, render him odious, and expose him to public contempt." *Pritchett*, 34 S.E. at 216 (quoting *White*, 20 S. E. at 78). These blacklists were held to be libel per se. *Id.*

The Georgia Court of Appeals addressed this tension in *Haggard v. Shaw*, 112 S.E.2d 286, 290 (Ga. Ct. App. 1959). There, the court raised the question of "whether the *Mell* and *Estes* cases . . . are reconcilable with the *White* case, the former all holding that it is not a libel per se to publish to another written language to the effect that he owes a debt which he refuses to pay, there being no imputation of insolvency and it not being alleged that the words caused special damage to the plaintiff in his trade or business." *Id.*[7] The court explained that it "is bound by the

---

[7] The *Haggard* court noted an earlier attempt to reconcile the cases on the theory that the *Estes* and *Mell* cases did not involve an allegation that the indebtedness was false, but the court rejected that theory, explaining that "[u]nfortunately, although the words of the opinions might support this distinction, examination of the record in the *Estes* and *Mell* cases shows affirmatively that the plaintiff alleged in each that he was not indebted and that the defendant's action was false and malicious, so we cannot rest upon this distinction." 112 S.E.2d at 290 (citing *Ramey v. McCoy*, 189 S.E. 44, 47 (Ga. 1936)).

decisions of the Supreme Court in the event of conflict with decisions of the Court of Appeals, and by the oldest decision of the Supreme Court in the event of conflict between the decisions of that court." *Id.* at 289–90. The court attempted to reconcile the cases by explaining that in that case as in *Mell*, there was "no imputation of insolvency in [the] letter, and the letter was not written to persons extending credit to the plaintiff so that it might fairly be assumed that its result would be to deny her credit with merchants generally, as was the result in the *White* case." *Id.* at 290. In contrast, it explained that "[i]t cannot be doubted that to publish one falsely as a 'deadhead' to the members of a retail merchants' association would tend to injure his reputation." *Id.* And, "[t]o so publish one to an employer might do the same, but the results, if affirmative, would result in special damage which could then be shown," essentially holding that sending a letter to an employer that an employee did not owe a debt would not be libel per se, but may be libel per quod. *Id.* "On this distinction," the court wrote, "the cases must rest; if it is invalid then" the court held that an older Georgia Supreme Court case controlled over *White*. *Id.* (citing *Van Epps v. Jones*, 50 Ga. 238, 241 (1873)).

Unfortunately, it does not appear that the Georgia Supreme Court saw it that way. *Conway v. Signal Oil & Gas Co.*, 194 S.E.2d 909, 909 (Ga. 1972). *Conway* again involved whether a letter to an employer falsely claiming that an employee owed an unpaid debt was libel per se. The employee's husband had a credit card

that the wife had paid for using checks on her account, but the wife was not liable for payment. *Id.* Despite her lack of liability, "when the bill became delinquent the [credit card company] wrote the [wife's] employer accusing her of being past due on her account and seeking the aid of the employer in collecting such indebtedness." *Id.* On appeal from summary judgment, the Georgia Court of Appeals relied on *Mell* and affirmed. *Signal Oil & Gas Co. v. Conway*, 191 S.E.2d 624, 627–28 (Ga. Ct. App. 1972), *rev'd,* 194 S.E.2d 909 (Ga. 1972). The Court of Appeals distinguished *White* essentially on the basis *Haggard* did above, writing that "[t]he letter contain[ed] no imputation of insolvency. It did not seek to alter her credit status; indeed, she was not then seeking any extension of credit and the information in the letter was neither used nor intended to be used to impair her credit standing." *Id.* at 628. On further appeal, however, the Georgia Supreme Court reversed. The court did not even mention *Mell*, but instead held that "[u]nder the decisions in *White* . . . and similar cases, the letter was libelous per se." *Conway*, 194 S.E.2d at 910.

Because the Georgia Supreme Court in *Conway* held that *White* applied outside of the merchant context, *Haggard*'s attempt to square *Mell* with *White* cannot stand. And because *Conway* reaffirmed *White*, *Haggard*'s backup conclusion that an older Georgia Supreme Court case governs over *White* cannot stand as well.

The Court is left with the conclusion that *Mell*, to the extent it conflicts with *Conway*, does not accurately state Georgia law.[8]

One final distinction to note: *Conway* involved a phone call to an employer. However, at least one other judge in this district, following *Conway*, found a false allegation of a debt to be actionable outside of the employment context in *Johnson v. Citimortgage, Inc.*, 351 F. Supp. 2d 1368, 1377–78 (N.D. Ga. 2004). In *Johnson*, a mortgage servicer "made false statements to credit reporting agencies that his account was delinquent," but the court noted that the servicer "could not reasonably infer that the account was delinquent since Plaintiff on more than one occasion disputed the accuracy of Defendant's accounting." *Id* at 1378 (citing *Conway*, 194 S.E.2d at 910 ("Accordingly, any contention that the defendant could reasonably infer that the plaintiff had assumed the account and become the debtor is without foundation.")). *Johnson* is persuasive on this point, because the "per se"

---

[8] As the dissent in the original Georgia Court of Appeals opinion in *Conway* noted, the confusion may have arose from the fact that courts have borrowed the requirement that libel per se amount to a charge of "a crime, dishonesty or immorality," but these requirements originally pertained to slander per se. *Rosanova v. Playboy Enters., Inc.*, 411 F. Supp. 440, 445 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978); *see Conway*, 191 S.E.2d at 630 (Evans, J., dissenting) ("Despite the clear distinction between libel and slander, many of the cases on libel reach over into the slander statute and attempt to measure libel by such statute, such as whether the article makes a charge as to one's 'trade, office, or profession, calculated to injure him therein', which words are peculiarly and solely applicable to the statute on slander. . . . We repeat that slander and libel should not be confused or mixed together."), *rev'd*, 194 S.E.2d 909.

nature of the defamatory statement means the statement is actionable in all contexts. *Beckman*, 752 F. Supp. 3d at 1373 ("To determine whether a statement is defamatory per se, courts look to 'the plain import of the words spoken.'") (quoting *Bellemead*, 631 S.E.2d at 695).

In sum, the Court finds that under *Conway*, a false statement that a person owes a debt and refuses to pay it can be libel per se under Georgia law. This will not turn every debt collection dispute into a libel case because: (1) the allegation of indebtedness must actually be false as in *Conway* (as opposed to arguable or subject to setoff or other partial defenses); (2) as the Court will explain below, the act of publication must be at least negligent, eliminating libel claims for bona fide disputes; (3) in doubtful cases, a creditor can always resort to litigation in lieu of informal debt collection, because allegations in pleadings are absolutely privileged. O.C.G.A. § 51-5-8.[9]

---

[9] Moreover, 15 U.S.C. § 1681h(e) provides qualified immunity for actions "in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, . . . except as to false information furnished with malice or willful intent to injure such consumer." This qualified immunity, combined with the limitations set forth above, would bar most libel claims arising from allegations of indebtedness aside from those which are obviously false, as was the case in *Conway*.

III.    **Negligence and Privilege**

The relevant communication for libel purposes occurred when T-Mobile turned over the account to Amsher and Convergent for debt collection. While the Court does not have the specific writing from T-Mobile to collections agencies in evidence, the Court can conclude that such a writing exists circumstantially from several pieces of evidence. *See John D. Robinson Corp. v. S. Marine & Indus. Supply Co.*, 395 S.E.2d 837, 840 (Ga. Ct. App. 1990) ("[C]ircumstantial evidence was presented to show the letter had been received and interpreted derogatorily.").

First, Plaintiff's Exhibit 7 is a May 7, 2025 letter from T-Mobile stating that "[s]hould you not make arrangements to pay your entire balance immediately, you risk permanent deactivation of your phone service and the possibility of further collection activity, including referral of your account to a collection agency." (Doc. 92-5). Next, Exhibit 1 is a letter from Convergent, which states that "**[t]he records** of T-Mobile USA **show** that your balance of $1,125.06 is due in full for mobile phone service." (Doc. 92-1) (emphasis added).[10] Taken together, these exhibits show T-Mobile intended to, and later did communicate that Mr. Phelps was indebted to it in writing to debt collectors. The Court finds that this communication was negligent for at least two reasons.

---

[10] Counsel for T-Mobile acknowledged at the hearing that T-Mobile referred Mr. Phelps to collections, but argued the communication was privileged communications for the purpose of libel. The Court rejects this defense below.

First, T-Mobile was aware that this case was contentious, putting it on notice that caution was necessary before proceeding with collections. Prior to the referral of the debt to collections, Mr. Phelps had already had an in-store dispute about returning his phones leading to the police being called. Mr. Phelps filed a lawsuit arising from the same transaction and occurrence. According to letters from T-Mobile's counsel, Mr. Phelps had already reached out to dispute that he owed a balance, but T-Mobile opportunistically sought a release of claims in exchange for zeroing out the disputed claims. (Pl.'s Ex. 9, Doc. 92-7).

Second, there was a significant basis for T-Mobile to doubt that the balance was actually owed. T-Mobile's counsel sent a letter dated June 12, 2020 arguing that the magistrate court "had no authority or power to close your T-Mobile account."[11] But as the Court explained in its Order of March 6, 2023, this reasoning is doubtful. (Doc. 65 at 11–15). And, as the Court held in its Order dated September 16, 2024 (Doc. 82 at 19–23), the plain language of the Service Terms supported Mr. Phelps's interpretation.

A reasonable person with this background knowledge would exercise caution before publishing statements to the effect that Mr. Phelps owed a debt. T-Mobile had two prudent courses of action. If it truly believed Mr. Phelps owed the

---

[11] This letter was sent after the publication to the collections agency, but it supports a reasonable inference that this was T-Mobile's position prior to that date.

debt, it could have filed a lawsuit to collect the debt. Or if it entertained doubts, it could have written off the balance. Instead, T–Mobile made the business decision to refer the matter to collections to try to extract money or a settlement from Mr. Phelps. This was at least negligent.[12]

Moreover, the communications to the debt collectors were not privileged. At trial, T-Mobile argued that its statements were privileged as statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned. O.C.G.A. § 51-5-7(3).[13] Conditional privileges are effective so long as they are not used "as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted." O.C.G.A. § 51-5-9. "To make the defense of privilege complete, . . . good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons must all appear." *Fine v. Commc'n Trends, Inc.*, 699 S.E.2d 623, 629 (Ga. Ct. App. 2010) (citing *Rabun v. McCoy*, 615 S.E.2d 131 (Ga. Ct. App. 2005)).

---

[12] The record contained evidence that could support a finding of maliciousness. Mr. Phelps had caused T-Mobile trouble by making a scene in one of their stores and successfully suing them. It is reasonable to infer that T-Mobile referred Mr. Phelps to collections in retaliation. But the Court need not make that inference to support its judgment.

[13] Counsel referenced subsection (4), but that subsection deals with matters of public concern, and the argument counsel made more closely tracks subsection (3).

T-Mobile did not meet its burden of establishing conditional privilege. First, as the Court explained above, referring to collections was a business decision unnecessary to preserve T-Mobile's rights. Even if Mr. Phelps was incorrect about terminating service by returns, T-Mobile could have terminated service for non-payment without Mr. Phelps's authorization and filed a lawsuit for the balance. Moreover, though Mr. Mills could testify about service connection and disconnection, his testimony lacked a foundation to show T-Mobile's collections process once an account is delinquent. The Court thus finds T-Mobile failed to meet its burden of establishing an affirmative defense of privilege.

 In sum, Mr. Phelps has met all of the elements of libel.

## IV.    Damages

Because the Court finds that Mr. Phelps has established libel per se, general damages are recoverable. *Atlanta J. Co. v. Doyal*, 60 S.E.2d 802, 812 (Ga. Ct. App. 1950). Mr. Phelps convincingly testified to his physical and mental distress that he suffered because of T-Mobile's false publication of his alleged debt to debt collectors and corroborated his testimony with medical records.[14]

---

[14] Mr. Phelps also offered evidence of derogatory credit reporting. Whether harm to one's credit is actionable special damages is an open question. *Johnson*, 351 F. Supp. 2d at 1373. But Mr. Phelps did not present evidence that he was denied employment or access to credit or utilities as a result of a derogatory credit report, and so the Court will not consider damage to credit as an item of damages.

The Court finds that Mr. Phelps's damages from emotional distress stemming from improper collection activity total $10,000. After reaching this finding, the Court consulted cases in the analogous context awards of emotional distress for stay violations for improper collection activity under the Bankruptcy Code, 11 U.S.C. § 362(k), and this amount seems within the range of analogous awards. *In re Poole*, 242 B.R. 104, 112 (Bankr. N.D. Ga. 1999) ($1,200); *In re Parker*, 634 F. App'x 770, 771 (11th Cir. 2015) ($2,000, affirming vacatur in part on other grounds); *In re Lansaw*, 853 F.3d 657, 670 (3d Cir. 2017) ($7,500); *In re Lyubarsky*, 615 B.R. 924, 934 (Bankr. S.D. Fla. 2020) ($25,000). Finding this amount sufficient to make Mr. Phelps whole and to deter future conduct by T-Mobile, the Court declines to award punitive damages. *Avery v. Schneider as Next Friend of Schneider*, 849 S.E.2d 1, 14 (Ga. Ct. App. 2020) ("In the case of a bench trial, the amount of [punitive] damages awarded is within the enlightened conscience of the trial judge.").[15]

---

[15] To the extent Mr. Phelps seeks to recover his costs of litigation, he must strictly comply with Local Rule 54.1. A form bill of costs can be found at http://www.uscourts.gov/forms-rules/forms/bill-costs-district-court.

## Conclusion

For the foregoing reasons, the Court finds for the Plaintiff. The Clerk is
**DIRECTED** to enter judgment in favor of Plaintiff in the amount of $10,000, plus
costs.

**SO ORDERED** this 15th day of September, 2025.

Victoria Marie Calvert
United States District Judge